CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant,
   vs. RAILROAD COMMISSION OF WISCONSIN, Respondent.

*January 16—February 3, 1914.*

*Railroad commission: Fixing freight rates, etc.: Refund of excessive
   charges: Review of orders: Burden of proof: Proceedings before
   commission: Evidence as to reasonable rates: Expert knowl-
   edge of commission: Comparison of rates: Cost of service: Re-
   ports of railroad companies: Judicial notice: Reports of em-
   ployees of commission: Presumption in favor of its orders.*

1. Upon complaint that a rate or charge exacted by a railway com-
   pany for any service is unreasonable and exorbitant, the rail-
   road commission may in one proceeding fix and order substi-
   tuted, under sec. 1797—12, Stats., a rate or charge which they
   find to be reasonable, and also, under sec. 1797—37m, find what
   would have been a reasonable rate for the service in question
   and award a refund of excessive charges paid.

2. An order of the railroad commission under sec. 1797—37m, Stats.,
   finding what would have been a reasonable rate or charge and
   directing a refund, may be reviewed in an action brought under
   sec. 1797—16, which authorizes an action to vacate and set
   aside "any order of the commission fixing any rate or rates,
   fares, charges," etc.

3. In a proceeding under sec. 1797—37m, Stats., it is not required
   as a condition of relief that the rate or charge be both errone-
   ous, illegal, unusual, and exorbitant. If it comes within either
   of those descriptive words, the commission should find what in
   its judgment would have been a reasonable rate or charge for
   the service in question.

4. Every rate or charge which is not reasonable and just under
   sec. 1797—3, Stats., may be found to be erroneous or illegal
   under sec. 1797—37m.

5. The railroad commission, in fixing rates under the statute, is
   not required to proceed with the strict formalities which ob-
   tain in courts of law or equity, and although the statute con-
   templates a hearing and the taking of evidence in such cases,
   there is a large amount of acquired expert knowledge which the
   commission may apply to facts in evidence in reaching its de-
   termination.

6. In an action in the circuit court to review an order of the rail-
   road commission fixing rates of transportation, the burden
   rests upon the plaintiff to show by clear and satisfactory evi-
   dence that the order complained of is unlawful or unreasonable.

7. What are just and reasonable railroad rates is a question akin to questions of the reasonable value of services or the reasonable value of property which has no fixed market value. In the investigation of such questions great latitude of evidence is necessarily permitted, and one of the recognized bases of opinion or judgment in such matters is the price paid or charged for other similar services or property. Although the value of such evidence necessarily varies according to the circumstances, a rate made thereon cannot be set aside as unsupported by evidence.

8. Another basis for computing a reasonable rate is the cost of the service to the carrier, aided and supplemented by a comparison with what it costs other roads to perform like services; and upon this question the statistical evidence supplied by the annual reports of railroad companies to the state board of assessments and to the railroad commission, and the freight tariffs filed by the railroad companies with the commission, together with the decisions of the commission showing methods of computing cost from the details contained in such reports, constitute a sufficient basis, more accurate and thorough than the ordinary statistical bases, for a computation of the cost to a railroad of any particular service.

9. All such reports, tariffs, and decisions being public records, they need not be formally offered in evidence before the railroad commission or certified up to the circuit court in every action brought to review an order of the commission, in order that they may be considered, but the commission and the court may take judicial notice of their contents, and both parties are at liberty to present computations therefrom in argument at any stage of the litigation, even in the supreme court.

[10. Whether or not the railroad commission has the right to use and consider reports made to it by persons employed by the commission under sub. (b) of sec. 1797—18, without offering them in evidence, not decided.]

11. If consulting such reports would be error on the part of the commission, the statutory presumption in favor of its orders would require the appellant therefrom to prove that reports mentioned in its opinion had reference to reports of this character.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

For the appellant there was a brief by *Edward M. Smart,*

*C. C. Wright,* and *C. A. Vilas,* attorneys, and *Edward M. Hyzer,* of counsel, and oral argument by *Mr. Smart* and *Mr. Wright.* They contended, *inter alia,* that it appeared from the findings of the court, as well as from the record of the hearing before the *Commission,* that the *Commission* considered, in addition to the evidence introduced, its own knowledge and facts ascertained by its own investigations but not introduced in evidence or made a part of the records. Such a method of fixing rates violates the constitutional requirement of "due process of law" and that justice be administered "conformably to law." *Interstate Comm. Comm. v. L. & N. R. Co.* 227 U. S. 88, 33 Sup. Ct. 185; *Interstate Comm. Comm. v. U. P. R. Co.* 222 U. S. 541, 32 Sup. Ct. 108; *Southern Pac. Co. v. Interstate Comm. Comm.* 219 U. S. 433, 31 Sup. Ct. 288; *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Commission,* 136 Wis. 146, 116 N. W. 905; *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 107 N. W. 500; *Ekern v. McGovern,* 154 Wis. 157, 142 N. W. 595.

A brief was also filed on behalf of the Minneapolis, St. Paul & Sault Ste. Marie and Chicago, Milwaukee & St. Paul Railway Companies, signed by *Sanborn & Blake,* attorneys, and by *Alfred H. Bright* and *Kenneth Taylor,* counsel for the former company, and by *Burton Hanson, O. W. Dynes,* and *J. N. Davis,* counsel for the latter; and the cause was argued orally by *John B. Sanborn.* Upon the same point they cited the following additional cases: *Louisville & N. R. Co. v. Garrett* (U. S.) 34 Sup. Ct. 48; *People ex rel. McAleer v. French,* 119 N. Y. 502, 23 N. E. 1061; *Union L. Co. v. Railroad Commission,* 144 Wis. 523, 129 N. W. 605; *Interstate Comm. Comm. v. N. P. R. Co.* 216 U. S. 538, 30 Sup. Ct. 417; *Interstate Comm. Comm. v. D., L. & W. R. Co.* 220 U. S. 235, 31 Sup. Ct. 392; *U. S. v. B. & O. S. W. R. Co.* 226 U. S. 14, 33 Sup. Ct. 5; *Sabre v. Rutland R. Co.* 86 Vt. 347, 85 Atl. 693; *Chicago, M. & St. P. R. Co. v. Minnesota,* 134

U. S. 418, 10 Sup. Ct. 702; *Ex parte Young,* 209 U. S. 123, 28 Sup. Ct. 441; *Mo. Pac. R. Co. v. Tucker,* 230 U. S. 340, 33 Sup. Ct. 961; *State ex rel. Great Northern R. Co. v. Railroad Commission,* 60 Wash. 218, 110 Pac. 1075; *Washington ex rel. Oregon R. & N. Co. v. Fairchild,* 224 U. S. 510, 32 Sup. Ct. 535.

The *Attorney General* and *Walter Drew,* deputy attorney general, for the respondent, argued, among other things, that the Railroad Commission Law does not require or contemplate that, in forming its decision and making its order, the *Commission* shall confine itself to consideration of the evidence produced upon its hearing in the case. The express provisions of the statute providing for and defining the court review of orders of the *Commission* clearly deny jurisdiction to the circuit court to set aside orders of the *Commission* upon the ground that the *Commission* has considered evidence other than that produced upon the hearing before the *Commission.* Neither constitutional limitations nor requirements of natural justice necessitate a construction of the Railroad Commission Law limiting the *Commission* in its ascertaining of the reasonable and lawful rate to consideration of the evidence taken upon its hearing. The *Commission* is not established as an inferior court whose actions are governed by the rules of evidence and procedure applicable to courts and made subject to review as those of an inferior court for errors in procedure. It is an investigating body, administrative in character, and its orders are not judgments or orders preliminary to judgments as the orders of a court, but, in the language of this court, "mere administrative rulings,"—mere provisional findings, in no respect conclusive or binding as affecting any substantive right.

If the *Commission's* orders, *i. e.* the duties or burdens which they prescribe, are right, are reasonable and lawful, they become expressive in the particular case of the legislative command. If they are wrong, if the rates named are

unreasonable or if they invade property rights, they can do no injury because the statute provides that action may be brought in the circuit court to vacate and render them null and void in such a case, and because upon such an action there may be a full trial upon the merits and upon the weight of the evidence, according in all respects to the "dissatisfied" party every essential of due process of law and of natural justice. Thus, the aggrieved party is fully secured in all his constitutional rights against being deprived of his property without due process of law or the taking of his property without just compensation and is assured equal protection of the laws, and all this quite regardless of the proceedings before the *Commission*. Nor are any constitutional rights of the appellant invaded by the provisions of the statute governing the action in the circuit court placing the burden of proof upon the plaintiff, defining the degree of proof required, or making the *Commission's* order *prima facie* evidence of its own validity. 8 Cyc. 924–926, and cases cited in notes; 10 Cent. Dig. tit. Constitutional Law, §§ 260–262; *Delaplaine v. Cook,* 7 Wis. 44, 54; *Plumer v. Marathon Co.* 46 Wis. 163, 179, 50 N. W. 416; *Will of McNaughton,* 138 Wis. 179, 188–190, 118 N. W. 997, 120 N. W. 288; *Borgnis v. Falk Co.* 147 Wis. 327, 352, 353, 133 N. W. 209.

TIMLIN, J. The appellant commenced this action against the respondent as authorized by sec. 1797—16, Stats., to review an order of the respondent *Commission* bearing date November 23, 1912, requiring appellant to establish a rate of 1.7 cents per 100 pounds for the transportation of ice from Silver Springs, Wisconsin, to Milwaukee, Wisconsin, instead of the rate of two cents per 100 pounds theretofore existing, and awarding plaintiff reparation upon all shipments moved between said points from January 16, 1911, to September 30, 1911, at the rate of three tenths of one cent for each 100 pounds transported.

The statute provides for a review of the orders of the *Railroad Commission* by action against such *Commission* instead of by appeal or writ. This is somewhat analogous to the ancient writ of error, the issue of which was considered for many purposes to be the institution of a new action to review the proceedings of the subordinate tribunal. But the questions presented by this action and the scope of review therein are matters wholly regulated by statute. The *Commission* is authorized by sec. 1797—12, upon complaint of any person that the rates are in any respect unreasonable or unjustly discriminatory, to notify the railroad complained of that such complaint has been made, and ten days' notice of the time and place when and where such matters will be considered and determined must be given to the railroad, and the parties to the controversy are entitled to be heard and entitled to process to enforce the attendance of witnesses. If upon such investigation the rate complained of shall be found to be unreasonable or unjustly discriminatory, the *Commission* is given power to make an order substituting therefor such rate as it shall have determined to be just and reasonable and which shall be charged, imposed, and followed in the future. It also has power to make such orders respecting such regulation, practice, or service as it shall have determined to be reasonable. The *Commission* may also proceed on its own initiative and make a preliminary investigation in order to ascertain whether sufficient grounds exist to warrant a hearing being ordered. Having determined this in the affirmative, notice is given to the railroad setting forth the rate investigated and fixing a time and place for a hearing on such rate. Notice may also be given in such case to other parties in interest. The railroad itself may also be complainant before the *Commission* with like effect as though the complaint were made by any other person.

The Railroad Rate Commission Act of this state has a number of features distinguishing it from the federal Interstate

Commerce Commission Act as originally adopted, and from the rate commission laws of some of the other states. Prominent among these distinguishing features are the initiative on the part of the *Commission,* the duty to find a fixed and definite point at which the rate will be reasonable, thus permitting the raising as well as the lowering of rates, also the provisions for review in the courts of the order of the *Railroad Commission,* thus giving the carrier its "day in court" before the *Commission* and also before the circuit court.

By sec. 1797—37m the *Commission* is, in addition to the ordinary power to fix rates, also given the power, upon the complaint of any person aggrieved that a rate or charge exacted is erroneous, illegal, unusual, or exorbitant, to hear this complaint and decide upon the merits thereof in the manner provided by sec. 1797—12; that is, upon notice and hearing. If the rate or charge made is found to be erroneous, illegal, unusual, or exorbitant, the *Commission* shall find what in its judgment *would have been* a reasonable rate or charge for the service complained of. If this reasonable rate is less than the amount exacted, the carrier shall have the right to refund to the person making such charges the amount so found to be excessive. For very obvious reasons the *Commission* is not given power to enforce this refund. Its power of decision is only *quasi*-judicial. But the party aggrieved may, after the findings of the *Commission,* maintain an action in the courts to recover the amount of such excessive charge as found by the *Commission,* and in the trial of this action the findings of the *Commission* are declared to be *prima facie* evidence of the truth of the facts found by it.

The proceeding in question was apparently taken by the *Commission* under the authority of secs. 1797—12 to 1797—37m, and no objection is made and none can be made to this joinder in one proceeding. The statutory action against the *Commission* for review authorized by sec. 1797—16 is one to vacate and set aside any order of the *Commission* fixing

any rate or rates, fares, charges, classifications, joint rate or rates, or any order fixing any regulations, practices, or service. This action must be based on the ground that the rate, etc., fixed in such order is unlawful or that the regulation, etc., fixed in such order is unreasonable. No review of the order for a refund made under sec. 1797—37m is expressly provided for in such action, unless the order finding that a rate or charge is erroneous, illegal, unusual, or exorbitant, and finding what would have been a reasonable rate or charge, is included in the words of sec. 1797—16, "fixing any rate or rates, fares, charges, classifications, joint rate or rates, or any order fixing any regulations, practices or service." Considering the remedial nature of sec. 1797—16, the quoted words last above may be taken to include the "would have been" finding required by sec. 1797—37m. The original complaint in this action did not seek to review that part of the order in question fixing rates for future traffic. The prayer of the complaint was "that a judgment be entered herein setting aside and holding for naught the order of said *Commission* (in so far as the same pertains to reparation) and for such other and further relief as to the court may seem just." There was no averment in the body of the complaint to the effect that the rate fixed in such order is unlawful or that any regulation, practice, or service fixed in such order is unreasonable. Sec. 1797—16. Instead of this, it was averred that the order "was unauthorized and contrary to law for the reason that no evidence was presented by the complainant upon which such an order could be predicated; that the findings of fact made by the *Commission* are without authority or within the jurisdiction of said *Commission*." "That the record upon which the *Commission* made its alleged findings of fact contained no evidence that the rates charged for the transportation of ice were exorbitant, unusual, illegal, or erroneous, and in fact found that said rate of two cents per hundred pounds, which rate was collected, was a 'little

higher than petitioner should be required to pay.' " "That under and by virtue of the statutes in such case made and provided said *Railroad Commission* is without authority to grant reparation unless it is found that the rate charged is exorbitant, unusual, illegal, or erroneous, and that, having no evidence upon which to base a finding required by law, said *Commission* exceeded its authority and was without jurisdiction to enter an order granting reparation." The appellant by leave of court on the trial amended its complaint, striking out the words "in so far as the same pertains to reparation," thus making the action an attack upon the order both as to rates and refund.

It is not required that the rate or charge be both erroneous, illegal, unusual, and exorbitant, but if it comes within either of these descriptive words the *Commission* shall find what in its judgment *would have been* a reasonable rate or charge for the service complained of. Every rate or charge which is not reasonable and just under sec. 1797—3 may be found to be erroneous or illegal under sec. 1797—37m. Hence there is nothing in the complaint which shows absence of jurisdiction on the part of the *Commission* to make the order complained of, unless it be an entire absence of evidence to support the findings or order of the *Commission,* or resting the order upon evidence taken in the absence of and without notice to the appellant. Doubtless the *Commission* is not required to proceed in this as in other respects with the strict formalities which obtain in courts of common-law and equity jurisdiction. But the statute contemplates a hearing and the taking of evidence in the matter of fixing rates. This is apparent from sec. 1797—12, which provides for notice and hearing, for the attendance of witnesses; of sec. 1797—13, which provides for administering oaths, issuing subpœnas, requiring production of documentary evidence, taking depositions, presence of a stenographer who is to make a transcript in long hand of the evidence and proceedings; and sub. (b)

of sec. 1797—16, providing that if, upon review in court, evidence shall be introduced by the plaintiff different from or additional to that offered at the hearing before the *Commission,* the court shall proceed as there directed. Nevertheless from the administrative nature of the tribunal, the requirements of expert knowledge, the nature of the duties required, and the subjects considered, there must be a very considerable number of duties which the *Commission* is authorized to perform without the formality of trial or hearing or the formal taking of evidence. This is true of all administrative tribunals. There is also a vast amount of acquired expert knowledge which the *Commission* may apply to facts in evidence, as, for illustration, when the number of tons hauled and the distance hauled and the whole cost is given, what part of it usually and ordinarily represents terminal expenses; the usual proportion of terminal expenses to miles hauled; the usual and ordinary ratio of distribution of freight charges according to the value of the product carried; what allowance or increase is usually and ordinarily made for size or bulk proportionate to weight; the average number of tons carried in a car; the ordinary proportion of empty to loaded cars; the ordinary consumption of fuel per train mile or per ton mile. or per passenger, and many other items of information which, while more difficult and complicated, are yet of the same nature as the expert knowledge of a farmer with reference to the number of acres which should constitute a day's plowing; a merchant with respect to the usual percentage of cost of packing and delivery; a sailor with reference to the usual number of miles which should be made in a given time and in a given direction with a given direction and velocity of wind. None of these estimates are mathematically accurate, but long practice in making estimates of that kind makes one an expert.

No evidence was offered in the circuit court, except that the plaintiff offered a certified copy of the proceedings be-

fore the *Commission,* including the testimony taken. From
this evidence it appeared that the commodity in question was
ice of an inferior quality, the market value thereof, the dis-
tance hauled, the kind of cars used, the weight carried in a
car, the distance carried (seven miles), the manner of load-
ing and the disposition of the cars and cargo at the point of
destination, the profit of the shipper, the shrinkage in the ice
and the rates charged for transportation of this commodity
by rail for different distances, in a great many instances in
the same locality and in other localities on this road and on
other railroads. These distances were not uniform, none of
them the same distance over which complainant's ice was
shipped, and the railroad hauls varied from about twelve to
sixty miles. There was also in evidence the former charge
of the appellant for moving ice between the same points,
which was something less than that fixed by the *Commission,*
and it was shown, or at least testified to, that prior to 1905 the
rate between the termini in question for ice of the kind in
question was 1.5 cents per 100 pounds. Had neither party
offered any evidence in the circuit court the order in question
must have been affirmed (sub. (c), sec. 1797—16), and upon
the plaintiff rests the burden of showing by clear and satis-
factory evidence that the order complained of is unlawful or
unreasonable. This is no great hardship on the railroad com-
pany, for it is in possession of all the evidence in its books
and papers or in public records necessary for this purpose.

What are just and reasonable rates is a question akin to
questions of the reasonable value of services or the reasonable
value of property which has no fixed market value. In the
investigations of such questions great latitude of evidence is
necessarily permitted, and one of the recognized bases of opin-
ion or judgment in such matters is a comparison with the
price paid or charged for other similar services or property.
*Stolze v. Manitowoc T. Co.* 100 Wis. 208, 75 N. W. 987; *Mil-
waukee & M. R. Co. v. Eble,* 3 Pin. 334. See cases collected

in 17 Cyc. 108, 109, 110; 16 Cyc. 1133 to 1145. Considering a similar question in the case of *Interstate Comm. Comm. v. L. & N. R. Co.* 227 U. S. 88, 33 Sup. Ct. 185, the court said:

"The commission considered evidence and made findings relating to rates which the carrier insists had been compelled by competition, and were not a proper standard by which to measure those here involved. The value of such evidence necessarily varies according to the circumstances, but the weight to be given it is peculiarly for the body experienced in such matters and familiar with the complexities, intricacies, and history of rate-making in each section of the country. So, too, the fact that a commodity rate is low may cast some light on the reasonableness of the higher rate on the class from which that commodity was taken or to which it might legally be restored. It is true that the old low locals, Mobile (west) to New Orleans, were maintained, while those from New Orleans (east) to Mobile were raised, is not conclusive against the reasonableness of new tariff put in force in 1907. But it was a fact tending to support the conclusion unless the difference was shown to have been warranted by proper rate-making. Of the sufficiency of the explanation, including the extent of the difference in empty car movement, the commission was authorized to judge. It also had before it the company's financial statement and general tariff sheets."

It was accordingly there held that a rate made upon such facts was not unsupported by evidence. Where there is no fixed market value, this method of ascertaining the value, the *quantum valebant,* by comparison with other similar things in which the element of value is known, or is better known, is primitive, old, and well established. It is subject to many infirmities and uncertainties like all attempts to explain or establish that illusive mental concept represented by the word "value" or that represented by the word "reasonable." The rates with which we compare may be themselves too low or high, or the analogy may be imperfect and there may be only an apparent but no real similarity to the case in hand. But

nevertheless the comparison tends to inform the mind and guide the judgment, it narrows the subjective estimate of value which can never be wholly eliminated, and it is frequently the only external or objective guide. In legal inquiries it cannot be disregarded merely because not syllogistically or mathematically accurate. It tends to establish probability or improbability, as the case may be, and more than this, it is indispensable in questions of unlawful discrimination in rates. There was, therefore, as shown by the certified copy in evidence, testimony before the *Commission* upon which it had a legal right to rely in fixing what *is* as well as what *would have been* a reasonable rate.

But the principal contention of appellant is that the order of the *Commission* fixing the rates and declaring the complainant entitled to reparation or refund was made in part upon evidence not produced before the *Commission* at the hearing nor brought to the attention of the appellant, hence that due process of law was denied to the appellant within the rule of the case last cited. The findings and order of the *Commission* are made at the foot of an opinion in which the *Commission,* after the manner of courts, sets forth in apparent explanation or justification of its decision the grounds upon which the same rests. The appellant points to the following sentences as indicating that the *Commission* considered such extraneous evidence:

"But in this as in most cases, the principal basis for computing the reasonable rate is the cost of the service to the carrier, and this cost has been ascertained in the present case by the methods often explained in decisions of this *Commission.* Considering the fact that the commodity involved is of comparatively low value in proportion to its weight, is transported in regular movements and is subject to little risk in transit, and considering also the rather heavy loading of ice and the fact that no extra equipment of any kind is necessary in handling it, it is apparent that this commodity is entitled to a comparatively low rate. While the rate must necessarily

be sufficient to cover the actual expense of the service, the traffic is of a kind that should not be expected to contribute as much in the way of interest upon the railway company's investment as does the average traffic on the line. An application of the principles just stated to the circumstances of this case seems to warrant the conclusion that the present rate of two cents per 100 pounds is a little higher than the petitioner should be required to pay. At the same time, the cost figures at hand do not at this time justify the *Commission* in fixing the rate as low as 1.5 per 100 pounds, the figure at which it was placed by the railway company up to about 1905. When the movement and terminal expenses of the railway company upon this traffic are properly adjusted to take account of the length of the haul and the other conditions peculiar to this traffic, it is found that a rate of 1.7 cents per 100 pounds is about fair as between the shipper and the carrier, and the establishment of such rate will be ordered."

This falls very short of saying that the *Commission* acted without evidence or acted upon evidence of extrinsic facts or circumstances not legally before the *Commission* at the hearing. On the contrary, the statement is that the *cost figures were at hand,* and one of the bases, in fact the principal basis, for computing a reasonable rate was the cost of the service to the carrier, which cost had been ascertained *by methods* often explained in decisions of the *Commission.* Decisions here referred to are public records entitled to judicial notice (sec. 1797—37n) and are doubtless *Buell v. C., M. & St. P. R. Co.* 1 Wis. R. R. Comm. Rep. 324 (see pp. 340 *et seq.*) ; *Pulp & Paper Mfrs. v. C. & N. W. R. Co.* 2 Wis. R. R. Comm. Rep. 168; *Ringle v. C., M. & St. P. R. Co.* 7 Wis. R. R. Comm. Rep. 170. These show the complexity of the questions investigated, the methods of arriving at cost, and the bases of computation.

The railroad companies are required to report annually to the state board of assessments and in considerable detail (sec. 1215—5, Stats.), and this report constitutes a public docu-

ment or record.   In addition to this, all railroads are required
to report in great detail to the *Railroad Commission* upon
blanks prepared and sent out by said *Commission* (secs.
1797—18 to 1797—21), and these reports are made annually
and comprise a volume of about 125 quarto pages each, are
on file with the *Commission*, and constitute public records or
documents.   Of the same character is the freight tariff made
and filed by each railroad company.   These annual reports
contain all the necessary data from which the cost of trans-
portation per ton mile or per train mile and the apportion-
ment of terminal expenses may be computed with as much
accuracy as it is possible to compute such cost.   Space will
not permit the elaboration of this report, but it may be said
that for the entire system and for Wisconsin, separately, the
total passenger revenue and the total freight revenue are sep-
arately stated.   In like manner the total operating expenses
and the account to which each class of items of this expense
is chargeable is also set forth.   The number of tons of freight
earning revenue, carried, the number of tons carried one mile,
and the number of tons carried per mile of road, and the aver-
age haul are given, the average amount of receipts for each
ton of freight and the average receipts per ton mile and per
mile of road, the number of employees engaged in each kind
of occupation and the wages of each group, the switching and
terminal expenses, the different commodities carried and the
tons of each and the percentage which each forms of the whole
tonnage carried, and many other data.   These reports and
the tariffs of freight rates filed by the several railroad com-
panies constitute a sufficient basis more accurate and thorough
than the ordinary statistical bases for a statistical computa-
tion of the cost to the railroad of any particular service such
as that in question here.   It is, of course, characteristic of
all statistical computations that they deal with class-frequen-
cies, ratios, and averages, and that slight errors may exist
in the bases without materially affecting the result.   In this

case if there is any error in the bases it was made by the appellant itself, for the *Commission* had before it defendant's report covering the period in question. In such case the actual average cost of the same kind of service may also be arrived at by the comparative method from like reports of other railroads performing the like service. The method of ascertaining what is a reasonable rate by a computation of the cost of service is here aided and supplemented by a comparison with what it costs other roads to perform like services. We do not think it necessary that these public documents be formally offered in evidence before the *Railroad Commission* or certified up to the circuit court in every action brought to review an order of the *Commission.* All parties know of their existence, the appellant itself furnished a report covering the period in question, the cost of the services in question was a fact peculiarly within the knowledge of the appellant if within the knowledge of any person, and the statute justly throws the burden of proof upon the appellant in the matter of showing that the rate fixed by the *Commission* is unreasonable. The *Commission* and the court may take judicial notice of the contents of these public records, and both parties are at liberty to present computations therefrom in argument at any stage of the litigation, even in this court.

With reference to judicial notice see *Paquete Habana,* 175 U. S. 677, 20 Sup. Ct. 290; *Caha v. U. S.* 152 U. S. 211, 222, 14 Sup. Ct. 513, and cases cited; *New York Indians v. U. S.* 170 U. S. 1, 18 Sup. Ct. 531; *Knight v. U. S. L. Asso.* 142 U. S. 161, 12 Sup. Ct. 258; *Gardner v. The Collector,* 6 Wall. 499; *State v. Swift,* 69 Ind. 505; *Larson v. First Nat. Bank,* 66 Neb. 595, 92 N. W. 729; *Central of Ga. R. Co. v. Butler M. & G. Co.* 8 Ga. App. 1, 68 S. E. 775; *Gordon, R. & Co. v. Tweedy,* 74 Ala. 232; *Scheffler v. M. & St. L. R. Co.* 32 Minn. 518, 21 N. W. 711; *McHenry v. Yokum,* 27 Ill. 160. It is urged by the appellant that the words in the decision of the *Commission* above referred to must be taken

to relate to reports of persons employed by the *Commission* under sub. (b) of sec. 1797—18, and the learned attorney general argues in support of the power of the *Commission* to use those reports without offering them in evidence. We do not find it necessary to decide this point and leave that question until it necessarily arises in a case, without expressing any opinion thereon. They certainly may use these for some purposes. It would be rather illogical, however, to presume that the *Commission* referred to these fragmentary and disconnected reports for the purpose of ascertaining cost of service when it had before it in official records a complete statistical basis for such computation in which many of the essential factors of distribution, average, and computation are made and verified by the appellant itself. The statutory presumptions in favor of the order of the *Commission* would require the appellant to prove that the opinion of the *Commission* refers to these reports of employees, if consulting such reports would constitute error, a proposition we are by no means disposed to admit. No such proof was made. The cost of the service is, of course, an important factor in fixing rates. What is a reasonable rate cannot be thus established with mathematical accuracy; the cost under one management may be less than under another. It must be prorated relatively, and the article carried and the risk of carriage and other factors must be considered. It includes the proportion of the overhead or fixed expenses chargeable to such service as well as the disbursements for wages, fuel, wear and tear, and other items. It requires statistical skill and experience to properly apportion to any commodity its proportion of the cost of the service, as the cases cited from the reports of the *Commission* amply show. But this item of evidence of what is a reasonable rate is much more effective to narrow the field of mere subjective valuation than the unaided comparative method. Although the cost method does not altogether exclude subjective considerations, it is, as was said in the opin-

ion of the *Commission,* the principal basis for computing a reasonable rate and recommends itself to those who are seeking for a more just and accurate basis of rate-making.    The evidential bases for the application of this method are more certain and are always before the tribunal, and are the proper subjects of judicial notice when embodied in a public record or document.   So that the *Commission* had before it the testimony of witnesses tending to prove what would be a reasonable rate by the comparative method of ascertaining that fact. All this testimony was certified to the circuit court.   At the same time the *Commission* had before it these annual reports of the appellant and other railroad companies and their freight tariffs, of which judicial notice is taken, and these documents contain plenary evidence from which the cost of service in question could be computed with that inexact but substantial verity characteristic of statistical computations when properly made.

It must be held that the ruling of the *Commission* was based in the instant case on these two kinds of evidence, analyzed and illuminated by the expert knowledge and experience of the *Commission* members, and on nothing else.

*By the Court.*—The judgment of the circuit court is affirmed.


BARNES, J., took no part.


MARSHALL, J.    The court is content to dispose of this case upon the ground that the *Railroad Commission* had before it, including what it might properly have taken judicial notice of, evidence supporting its decision.   My opinion enables me to concur, subject to further study, when my brethren shall see fit to take up and decide the more important questions which the parties came here to have answered.

I think, as said upon another occasion,—*Income Tax Cases,* 148 Wis. 456, 134 N. W. 673, 135 N. W. 164,—that

in cases where all the people of the state are deeply interested in having a judicial determination of serious disputes affecting their welfare, and all are actually or in effect represented at the bar of the court and appealing to it for such determination, and it has ample jurisdiction to do .so,—there should be no effort to minimize the scope of the response; but rather effort to make it as broad as the limits of the controversy in all its aspects. Why dispose of such a case upon one point and leave others, and perhaps, as here, the most important ones, undecided; making further judicial hearings necessary before those having to do with the great business activities of the state can know just what their rights are? Long periods of uncertainty respecting the law are harmful beyond measure.

I think the old method of deciding as little as actually necessary to the particular case, so that litigants must needs resort, again and again, to the court in order to settle an entire controversy, should be laid aside, especially in these cases having to do with the validity and scope of new and rather novel legislation. The court—instead of proceeding with that overcaution, as it seems to me though sanctioned by precedent—which increases judicial and professional labor in the end, gives rise to false ideas of the cause therefor, prolongs uncertainty, and saps private and public resources—should grapple with an entire controversy with all its major and material germane features, and rest from its labor only by the rendition of a broad, fully rounded out, efficient judgment in such cases of great public importance as this. The need therefor is such that this court should wash its hands as completely as practicable of even appearance of needless delay in giving such tribunals as the *Railroad Commission* and the parties who have to deal therewith all the aid which the judicial function enables it to give.

I appreciate that my associates are just as anxious as I am to deal as fully with matters presented here for decision

as is judicious in cases as they arise, but there is, at times, a difference in inclination to break away from the ancient method of reaching a conclusion for the case without deciding any more of the controverted questions involved than necessary.

The overshadowing matter of difference which led to this litigation,—the one which has, doubtless, particularly vexed the *Railroad Commission* and the parties required to appear before it, ever since the system of regulation administered by such a commission was created,—is whether the rights of parties can jurisdictionally and constitutionally be determined by it without all the essentials of a common-law hearing,—the incidents of reasonable notice and opportunity to be present, knowledge of the matter to be investigated, reasonable opportunity to produce witnesses, knowledge of all the adverse evidence to be considered, and opportunity to oppose it with evidence. Does the *Commission* exceed its jurisdiction and so incapacitate itself from rendering a valid decision by grounding its action on evidence gathered, *ex parte,* by its employees or its own members and not known to the contestants? Must it proceed in the manner indicated as jurisdictionally requisite in *Ekern v. McGovern,* 154 Wis. 157, 142 N. W. 595, and as is generally required of a *quasi*-judicial tribunal, keeping and preserving a record of all the evidentiary bases of its decision, so that it may be attacked directly for jurisdictional error, or impeached collaterally as void for such error? I would meet these questions now and solve all uncertainties, once for all, so far as this court could accomplish that much desired result. I may well repeat, in effect, what I said in the *Income Tax Cases.* The field untouched by the decision was as fully covered by eminent counsel as it is liable to ever be, all interests call loudly for its chosen instrumentality for such work to grapple with that now presented with urgent appeal for the task to be performed. While it is according to precedent to minimize the

judicial response to the actual necessities of the particular situation, I would cast aside the hindrances to real judicial progress and judicial efficiency, where the court has competency in that regard. I think progress along that line would go far to obviate seeming faults in the law and the common impatience with the law's delays.

From what I have here said, I appreciate that my concurrence with the result reached by the court rests largely on my apprehension that the *Railroad Commission,* in administering the legislative system for public utility regulation, is not fenced about by the common requirements of hearings by *quasi*-judicial tribunals, except in so far as they have been wrought into the written law; but I forego discussion of the subject, preferring to let such discussion wait upon some future occasion therefor.

The following opinion was filed March 11, 1914:

WINSLOW, C. J. (*concurring*). I am in entire accord with the opinion of the court, and I add this brief memorandum simply to emphasize my approval of the scope of the decision. We have had many new laws covering many new and untried fields of legislation spread upon our statute books during the last few years. By these laws business operations of the greatest importance, involving the most complicated public and private rights, are to be controlled and regulated by new methods and by new tribunals. The ordinary finite mind is not wise enough to look ahead and unerringly apprehend in advance the precise effect of all the provisions of this new legislation, and lay down rules of construction which shall infallibly operate to produce the desired results. That which appears beforehand to be an entirely reasonable and unobjectionable rule may afterward, in the light of actual experience, be demonstrated to be unwise and even absurd. The course of wisdom under such circumstances is to pro-

ceed with caution.  The experienced navigator does not order "full steam ahead" when proceeding along a new and uncharted coast.  I am not aware that either the people of the state or the administrative boards have had reason to complain in the past of any hesitancy or unwillingness on the part of this court to meet and solve the great public questions which have been submitted to it, nor do I think there is any such cause now.  In the present case it was not claimed, nor was it the fact, that any methods were used by the *Commission* in reaching their conclusion other than those approved in the opinion of the court.  When it shall appear that other methods have been used and those methods are challenged as illegal, the accompanying circumstances will also appear which have been deemed to make the use of such methods essential, and in the light of those circumstances the question will be approached with far better prospect of reaching a wise and workable result.  Meanwhile the work of the *Railroad Commission* will doubtless proceed as it has in the past. If the arms of that body have been in any respect palsied by uncertainty as to their powers, I have not observed the fact.